320 So.2d 716

**Johnny Daniel BEECHER**

v.

**STATE of Alabama.**

**8 Div. 426.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1974.

Rehearing Denied Oct. 29, 1974.

214

U. W. Clemon, Birmingham, Elaine R. Jones, New York City, for appellant.

William J. Baxley, Atty. Gen. and David W. Clark, Asst. Atty. Gen., for the State.

WRIGHT, Judge.[1]

Appellant appeals from a conviction of murder in the first degree with a sentence of life in the penitentiary. The conviction was the third for this offense. The first two convictions were reversed by the Supreme Court of the United States for admission into evidence of confessions determined to be involuntary. *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); *Beecher v. Alabama,* 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317 (1972). Neither of the confessions involved in the other trials was attempted to be introduced in the trial below.

Defendant Beecher, a black man, was charged with the murder of a young white woman in Jackson County, Alabama on June 15, 1964. On that date, Beecher was an inmate in the prison system of Alabama. He was assigned to a State highway road camp near Scottsboro, Alabama.

The evidence tended to show that on the morning of June 15, 1964, Beecher, with other convicts, was carried by truck to a site on a State highway for work. At about 8:30 A.M. he was missed by the guard in charge and determined to have escaped. The place of escape was some eight-tenths of a mile from the home of the deceased.

Within a few minutes of learning of the escape, the guard proceeded along the road notifying residents that a convict had escaped. He received no response in knocking on the door of the deceased, though she was at home when her husband left for work earlier that morning.

At about 10:00 A.M. the husband of the deceased was contacted to learn of her whereabouts. He came home to investigate and found the house disarranged. At

1. July 3, 1974, pursuant to § 6.10 of the Judicial Article, Amendment No. 328 of the Constitution, the Chief Justice assigned to this Court the judges of the Court of Civil Appeals for temporary service.

about 1:30 P.M. on the 15th tracking dogs belonging to the prison system were brought to the place where Beecher was last seen. There was a track in the sand where he had been. The track was identified as that of Beecher by a mark on the heel or sole of the prison issue shoe known by the guard. From that track, the dogs followed a trail to the rear of deceased's home. After searching in the vicinity of the home for several minutes, the dogs picked up a scent and followed it toward a mountain for a mile or two. They came to bay in an abandoned shack and were followed to the shack by their handlers. There was found in the shack an undershirt identified as prison issue. Leaving the shack, the dogs again followed a scent to an old strip mining area. There they came upon a crowd of people numbering 75 to 100. The scent they had been following was lost for a time.

Later the same evening the dogs picked up a trail and followed it to the Tennessee River. Efforts to pick up the trail on the opposite bank were not fruitful. A sighting of a man near the railroad in South Pittsburg, Tennessee, was reported and the dogs and their handler were brought to the scene. There, in a dry creek bed, the same shoe mark was observed as had been seen at the place of escape and at the home of the deceased. The trail from that point was subsequently lost when the dogs followed it onto the railroad. On June 17, Beecher was seen walking along the railroad tracks at South Pittsburg, Tennessee by the Chief of Police. The Chief chased Beecher into a wheat field where he was halted by a shot in the leg. He was wearing prison clothing and a "light looking" undershirt.

At about 10:00 A.M. on the morning of June 16, searchers found the body of deceased in the strip mining area. The body was tied hand and foot and was gagged. Around the neck was a web belt by which she had apparently been strangled to death. The cloth ties, and the belt were identified as prison issue and one of the strips of cloth had the prison stamp upon it. The cause of death was determined to be manual strangulation and the time of death established as at or near 5:25 P.M., June 15, 1964. Examination by the State Toxicologist disclosed non-viable male spermatozoa present in the vagina of the deceased, though no injury to the genital area was found. The last known sexual intercourse was with her husband early on the night of June 14. The smear containing spermatozoa was taken by the toxicologist at about 1:30 P.M. on June 16. Spermatozoa is generally not detectable after 18 hours from intercourse, but may be found after longer periods in the vagina of a living woman.

The first trial of appellant was held in Jackson County, Alabama. The second trial in Cherokee County, Alabama. Upon motion for change of venue, the third trial was moved some 100 miles away and almost across the state to Lawrence County. Arraignment occurred in Lawrence County on April 6, 1973. Appellant entered a plea of "Not Guilty." Motions for change of venue charging inflammatory and prejudicial publicity through news media in Lawrence County were heard and denied. Motion to quash the jury venire for invidious discrimination against negroes in selecting jurors was heard and denied. Motion to suppress any and all statements alleged to have been made by Beecher to officers outside the presence of counsel was heard and denied. Trial was commenced on June 18, 1973.

After presentation of the State's case, motion for directed verdict of acquittal was denied. Arguments of counsel were presented, the court charged the jury and a verdict of guilty with a sentence of life imprisonment was returned on June 21, 1973. Motion to set aside and for new trial was denied. This appeal followed.

Appellant first contends error in denial of his motion to strike the jury venire for

alleged invidious discrimination by the Jury Commission of Lawrence County in the selection of jurors.

In support of the motion to strike, appellant took lenghty testimony relative to the racial make up of the population of the county, and the methods used by the Jury Commission in selecting names of citizens placed on the jury roll and subsequently placed in the jury box for selection of a particular venire. Negro citizens of the county were examined as to their knowledge of the number of negroes in the county.

The evidence presented by appellant tended to show that in 1970, there were 12,934 whites over the age of 21 years and 2,355 negroes over 21 years of age residing in the county.

Thus, the ratio of negro to white presumed qualified for selection as jurors was 15.4% in 1970. The statutory qualifications for inclusion on the jury roll are set by Title 30, Sec. 21 of the Alabama Code.[2]

Examination of the Jury Commission disclosed there were an estimated 3,000 names on the jury roll at the time of drawing the venire for the trial of appellant. There was no designation nor indication in the records of the Commission nor on the roll of the race of jurors. Testimony of a Commissioner was that he believed there to be some 20% negro representation on the roll. Appellant presented several negro witnesses who examined the jury roll in an effort to recognize the names of negroes. Each witness identified various names including his own. Though contending a wide acquaintance among negro citizens, each witness admitted there were many unknown to him. From the roll, the witnesses identified a collective total of 155 negroes by name. If all were identified, the ratio of negroes on the roll was 5.2%.

Two Jury Commissioners were examined along with the clerk. Their terms had begun in 1971. The long-time chairman and third Commissioner had died two weeks prior to the trial. Names for the jury roll were stated to come from examination of voting lists, tax records, telephone directories, recommendation of the Circuit Judge and other officials and individuals, key men in the various beats and from the personal knowledge of the Commissioners. The Clerk stated she visited the beats in the county, attended political rallies and community action meetings. Names of persons obtained in such manner were presented for consideration to the Commissioners. Neither of the Commissioners nor the Clerk knew more than 100 negroes in the county. Most of the negro citizens lived in a few beats, with some beats having no negroes in residence. None of the lists used identified persons by race. There was no indication either on the jury roll or the jury cards placed in the box of the race of the person listed. Thirteen venires of the 15 or 16 drawn and used in

2. Title 30, § 21, Code of Alabama Qualifications of persons on jury roll; excusing certain persons from service.—"The jury commission shall place on the jury roll and in the jury box the names of all citizens of the county who are generally reputed to be honest and intelligent and are esteemed in the community for their integrity, good character and sound judgment; but no person must be selected who is under twenty-one or who is an habitual drunkard, or who being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror; or cannot read English or who has ever been convicted of any offense involving moral turpitude. If a person cannot read English and has all the other qualifications prescribed herein and is a freeholder or householder his name may be placed on the jury roll and in the jury box. No person over the age of sixty-five years shall be required to serve on a jury or to remain on the panel of jurors unless willing to do so. When any female shall have been summoned for jury duty she shall have the right to appear before the trial judge, and such judge, for good cause shown, shall have the judicial discretion to excuse said person from jury duty. The foregoing provision shall apply in either regular or special venire." (1939, p. 86; 1943, p. 309, appvd. July 1, 1943; 1966, Ex.Sess., p. 429, § 4, appvd. Sept. 12, 1966.)

trials during the year 1972 were introduced. From these venires containing some 1,000 names, appellant's negro witnesses were able to identify 49 as being black. Each venire contained some persons recognized as negro. The Presiding Judge of the Circuit stated that his observation of the venires, as they actually reported in court, disclosed an average of 8 to 10 blacks out of the total of 75 to 80 on each venire. Of the 75 jurors drawn for trial of appellant in April, 1973, there were 5 blacks. The second venire drawn in June, 1973, contained 4 blacks. Of 58 jurors reporting on trial day, 3 were black.

Appellant submits that the statistical disparity between the number of blacks presumed to be eligible for duty as jurors and the number shown to be actually included on the jury roll, as well as the disparity in the percentage of blacks in relation to the percentage of whites contained on the roll establishes a prima facie case of invidious discrimination against blacks in violation of the United States Constitution.

■ It has long been established by federal statutory law, 18 Stat. 336 (1875), 18 U.S.C. Sec. 243 and the constitutional law established by the Supreme Court of the United States and applied to the states through the Equal Protection Clause of the Fourteenth Amendment, that a conviction of a negro by a jury from which negroes have been systematically excluded by reason of their race cannot stand. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880); *Pierre v. State of Louisiana*, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Swain v. State*, 275 Ala. 508, 156 So.2d 368. Systematic exclusion means a purposeful non-inclusion based solely on race. *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839. The burden of proving discrimination by systematic exclusion is on the defendant, *Akins v. Texas*, 325 U.S. 398, 65 S.Ct.

1276, 89 L.Ed. 1692; and "purposeful" discrimination may not be assumed or merely asserted, it must be proved. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759. However, once a prima facie case has been established the burden is upon the state to refute it. *Swain v. State, supra.* The question of proof necessary to establish discrimination is a matter of federal law. *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.

■ Appellant contends that a showing of "statistically significant disparities between the percentage of blacks eligible to serve on juries and the actual percentage on jury rolls establishes a prima facie case of racial discrimination." This is a broad statement with which we do not agree, and which we do not find supported by decisions cited of the United States Supreme Court. It was stated in *Alexander v. Louisiana, supra*, as follows:

"This court has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that factual inquiry is necessary in each case that takes into account all possible explanatory factors."

In the case of *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) though commenting on the "substantial disparity" between the percentages of negro residents in the county and of negroes on the jury list, it was further stated that it was shown that such disparity, at best, in part, originated from the subjective action and decisions of the Jury Commissioners. The combination of mathematical disparity with proved improper exercise of the selection process established the prima facie case of discrimination.

■ In the case before us there is no proof of use of improper subjective judgments by the Jury Commissioners which caused or contributed to mathematical dis-

parity between blacks presumed eligible and those selected. There may be drawn the conclusion from the statements of the Commissioners that they had not well performed their statutory duties of compiling the jury roll, but such ill performance applied equally to both white and black. Of the 12,934 whites presumed eligible for inclusion on the jury roll, less than 25% were included. The evidence disclosed no purposeful design by the Commissioners not to include qualified blacks on the roll, except as may be concluded from mathematical statistics presented.

Of those negro witnesses appearing to testify, each, with his wife, was found to be present on the roll. Every venire drawn for the previous year of 1972 included blacks. None of the witnesses, being educators and presumed leaders in the black communities, had ever offered names of blacks to the Jury Commission for placing on the roll and none indicated refusal of or failure to include blacks qualified for jury service by the Commission. It has not been shown that the blacks (on the jury roll and the prior venires drawn) known to and identified by the witnesses were all the blacks contained thereon. Thus, the accuracy of the mathematical percentage presented by appellant is not conclusive.

The percentage of up to 8.3% blacks on venires chosen in 1972, the admitted percentage of over 5% on the entire jury roll for 1973 together with over 5% on the venire drawn to try appellant, cannot be said to be only token inclusion when the total blacks presumed qualified is only 15%. *Swain v. Alabama, supra.* There was no evidence to demonstrate the proportion of negroes actually qualified as jurors under the statute. We conclude as did the court in *Swain v. Alabama, supra,* that "we cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%."

We do not consider the evidence in this case to make out a prima facie case of invidious discrimination under the Fourteenth Amendment. However, in view of the presence of reasonable basis for the question of discrimination being presented in this case, we strongly recommend to the Jury Commission of Lawrence County that every effort be promptly made to fill the jury roll with the names of all citizens of the county found to be qualified under Title 30, Sec. 21, Code of Alabama so that no colorable foundation for challenge upon grounds of discrimination may ever again be available. Such is the duty imposed by the law of the state upon the Jury Commission in every county.

Appellant next charges error in the denial of his motion for change of venue because of prejudicial pre-trial publicity.

Evidence in support of the motion was presented by appellant. It was shown that two newspapers were primarily circulated and subscribed to by the citizens of the county. One was The Decatur Daily and the other a weekly, The Moulton Advertiser. It was shown that articles had appeared in each of these papers over the nearly 10 years since the commission of the crime and the apprehension of appellant. Some of the reports were headlined on the front page. There had been several articles in each paper since the transfer of the case for trial to Lawrence County, together with a picture of appellant on the courthouse steps. Many of the articles were introduced in support of the motion. Appellant submits that the articles were so extensive, pervasive and inflammatory as to prejudice the jury and prevent a fair trial by an impartial jury as guaranteed by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment. Appellant cites for support the case of *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

An examination of the articles discloses them to be nothing more than usual

objective reporting. The crime with which appellant is charged occurred more than 100 miles away from Lawrence County. Though the crime was heinous, the articles do not comment more than generally upon the alleged facts of it. The articles largely were picked up by the newspapers from wire service reports which were available to subscribing newspapers throughout the state. It was only after the third trial of the case was transferred to Lawrence County that local reporting occurred. The immediate pre-trial publicity was merely reporting of the transfer, arraignment, setting of the trial with limited information of the charge. The facts of prior trials, convictions and reversals thereof by the Supreme Court of the United States were reported without comment.

Appellant was allowed extensive voir dire examination of the jury venire. Less than half the venire acknowledged reading or hearing anything about the case. Some faintly remembered reading about the case when it first was reported in 1964. One or two jurors expressed inability to fairly judge the case because of prior information. The others denied any prejudice against the appellant.

■ This court does not find in the pre-trial publicity any highly pervasive or prejudicial matter. We further find nothing even remotely close to the type or amount of publicity present in the *Sheppard* case. It is the law in this state that on a motion for change of venue in a criminal case, the defendant has the burden of showing that a fair and impartial trial cannot be had. *Boutwell v. State*, 279 Ala. 176, 183 So.2d 774, *Mathis v. State*, 292 Ala. 732, 296 So. 2d 764. This view is supported by *Irvin v. Dodd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751, and *Hale v. United States*, 435 F. 2d 737 (5th Cir. 1970). The voir dire of the venire by counsel fails to support the necessary requirement of showing jury prejudice in this case.

Appellant charges prejudicial error in the overruling of a motion to suppress and the admission into evidence of an alleged statement made by appellant to a deputy sheriff at the time of the second trial.

As disclosed by the two reversals of prior convictions, *Beecher v. Alabama, supra*, appellant had made two alleged confessions while under interrogation during the several days following his arrest. Such confessions were found to be involuntary and his conviction was reversed because of their admission illegally into evidence. Evidence taken on the motion to suppress tended to show that in February 1969, while the jury was deliberating in the second trial held in Cherokee County, appellant was in a witness room of the courthouse under guard of Deputy Sheriff Ken Phillips. The Deputy stated that without interrogation or even discussion of the case, appellant stated in substance, "I'm scared of that electric chair, but I don't deserve to walk the streets because I'm a guilty man." This remark was reported by the Deputy several days later to his superior, the sheriff of Cherokee County. The sheriff at some later time reported it to the prosecutor. In the meantime, appellant was convicted and again given the death sentence.

Appellant denied making the statement as related by the Deputy.

Appellant contends the statement was admitted in violation of his Fifth and Sixth Amendment rights because the statement was not preceded by *Miranda* warnings and were made while he was in custody and without advice of counsel.

At the time of the making of the alleged statement, appellant had been in custody for some seven years. He had been through two trials for murder. He had appointed counsel since prior to his first trial. There is no indication that he had been under interrogation since his arrest and the taking of the confessions which had been declared involuntary by two appeals to the Supreme Court of the United States. The deputy to whom the statement

now in issue was made, was not an arresting or investigating officer and had never been involved in the case. He was not a deputy in the county where the crime was committed. At the time of the statement he was serving as a bailiff for the court during the trial. Appellant had just been tried by a jury which was then deliberating his guilt or innocence. Within an hour after the statement he was found guilty and sentenced. At the time of the statement, the deputy had no reason to be interrogating appellant as to his guilt.

There has probably been no case of the Supreme Court of the United States more widely discussed, analyzed, criticized and applauded than *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; however, in that decision it was made very clear that only confessions made involuntarily were inadmissible. The court stated the following:

"[63–65] In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

■ The trial court was at liberty to believe the deputy as to the making of the statement and the circumstances under which it was made. The court having formed such belief, the finding of a spontaneous, voluntary confession of guilt was proper. An unsolicited remark, not in response to any interrogation does not fall within the rule of *Miranda v. Arizona, supra; United States v. Powers,* 444 F.2d 260 (5th Cir. 1971); *United States v. Trosper,* 450 F.2d 319 (5th Cir. 1971); *Bedingfield v. State,* 47 Ala.App. 677, 260 So.2d 408; *Veith v. State,* 48 Ala.App. 688, 267 So.2d 480.

■ Appellant charges error in the admission of evidence, over objection, by the toxicologist of the presence of male spermatozoa in the vagina of the deceased. The contention of appellant is that this evidence was unrelated to the crime of murder, had no probative value, and served only to influence the minds of the jury. We do not agree.

The evidence tended to show that the deceased was taken from her home early on the morning of June 15. The time of her death was shown to be in the late afternoon of the same day. She was found bound hand and foot, gagged and strangled to death by a belt. Evidence of what occurred to her during the continuous events leading up to her death, together with the physical condition of her body when found, is collectively a part of the res gestae and is admissible to shed light on the acts, nature, motive and intent of the defendant. It matters not that such evidence includes matters showing or tending to show other crimes for which the defendant is not on trial or with which he has not been charged. *Jackson v. State,* 229 Ala. 48, 155 So. 581; *Smarr v. State,* 260 Ala. 30, 68 So.2d 6.

Appellant last charges error in failure to grant a new trial because of a comment made by the District Attorney in his argument to the jury.

■ It has long been the law of this state that any comment to the jury by the

prosecutor concerning a criminal defendant's failure to testify requires the granting of a new trial.[3]

The record before us in this case shows that in his closing argument to the jury the prosecutor made the following statement:

"No one took the stand to deny it."

The reporter did not take the argument of counsel in this instance. No request was made that he do so. The record therefore does not show the context in which the statement of the prosecutor was made. The record made of the discussion between counsel and the court in relation to the objection made is before us. The court made observation of what it perceived the state and federal law to be when counsel comments that testimony is uncontradicted or not denied. The court then stated that the objection was overruled because "The court finds that this was not a reference to the failure of the defendant to take the stand." There was then a statement by one of counsel for appellant that for the record, "Mr. Black, when making that statement was referring to the testimony of Ken Phillips." It may be remembered that Ken Phillips was the deputy who testified as to defendant's admission of guilt in his presence.

The statute of this state forbidding comment upon the failure of a criminal defendant to testify was in effect long before the cases of *Griffin v. State of California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, and *Chapman v. State of California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, were decided. Decisions of the Supreme Court of this state have pronounced the general rule interpreting our statute to be

that statements by the prosecutor that the state's evidence is undenied or uncontroverted are merely in direct reference to the defendant's failure to testify and do not violate the statute. *Sellers v. State*, 48 Ala.App. 178, 263 So.2d 156, and cases cited therein. It is only in cases where such remarks are in reference to testimony which only the defendant is capable of denying or contradicting that our appellate courts have held the statute violated. *Street v. State*, 266 Ala. 289, 96 So.2d 686.

In this instance, from the record, we are unable to make a finding as to the context in which the complained of remark was made by the prosecutor. The trial judge was familiar with the law of this state regarding such remarks and it was his finding that the remark was not a reference to the failure of the defendant to take the stand. We have only the remark of counsel for defendant as to what testimony the argument was directed. Under such circumstances we must follow the presumption that the ruling of the trial court was correct. *Bryant v. State*, 49 Ala.App. 359, 272 So.2d 286, cert. den. 289 Ala. 740, 272 So.2d 297, cert. den. 412 U.S. 922, 93 S.Ct. 2744, 37 L.Ed.2d 149.

Certainly, there is not presented in this case the statutory approval of commenting on the failure of the defendant to take the stand by the prosecutor and the court as was the case in both *Griffin v. California* and *Chapman v. California, supra*. Neither are there present the numerous and repetitive direct comments of the prosecutor as in *Chapman*.

Having searched the record as required by law we find no error prejudicial to ap-

---

3. Title 15, § 305. The defendant in criminal cases a competent witness for himself.—On the trial of all indictments, complaints, or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness; and his failure to make such a request shall not create any presumption against him, nor be the subject of comment by counsel. If the solicitor or other prosecuting attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within thirty days from entry of the judgment. (1949, p. 150, appvd. June 23, 1949.)

pellant. We therefore affirm the trial court.

Affirmed.

BRADLEY and HOLMES, JJ. (Ct.Civ. App.) and TYSON and HARRIS, JJ., concur.